PEOPLE ex rel. STANDARD WATER METER CO. v. MONROE.

(Supreme Court, Appellate Division, First Department. June 5, 1903.)

1. MUNICIPAL CORPORATIONS—GREATER NEW YORK—COMMISSIONER OF WATER SUPPLY—DUTY TO TEST METERS.

Greater New York Charter, § 475 (Laws 1897, p. 165, c. 378), authorizes the commissioner of water supply to cause water meters, the pattern and price of which shall be approved by the board of aldermen, to be placed in all stores, etc., and, if authorized by the board of aldermen, in all apartment houses, etc. Rule 13 of the department of water supply, gas, and electricity declares that all meters, before being placed, must be sent to the department pipeyards to be tested. *Held*, that while, as a general rule, it is the duty of the commissioner, on request, to test a meter, the pattern and price of which have been approved by the board of aldermen, he cannot be compelled by mandamus to go on making individual tests of a certain kind of meter approved by the board, after he has given one of them a thorough test and found it to be defective; his objection to it being directed to the principle on which it is constructed.

2. SAME—BOARD OF ALDERMEN—APPROVAL OF PATTERN AND PRICE OF METERS —SUFFICIENCY.

A resolution of the board of aldermen reciting that "the pattern and price of water meters manufactured by the S. W. M. Co., of this city, is hereby approved for use in the city of New York," is not a sufficient approval of such meters, within section 475 of the charter.

Appeal from Special Term, New York County.

Application by the people, on the relation of the Standard Water Meter Company, for a peremptory writ of mandamus, directed to Robert Grier Monroe, as commissioner of water supply, gas, and electricity of the city of New York. Writ denied (79 N. Y. Supp. 956), and relator appeals. Affirmed.

Argued before PATTERSON, HATCH, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

G. E. Waldo, for appellant.

Theodore Connoly, for respondent.

O'BRIEN, J. The relator made application for a peremptory writ of mandamus, requiring the commissioner of water supply, gas, and electricity to test at the pipeyards, pursuant to rule 13 of the department, a "Standard current water meter" manufactured by the relator, which had been ordered by a customer, and, if said water meter should pass a satisfactory test, to permit the same to be installed on premises at Third avenue. The commissioner, from information received by him from the chief engineer and assistants in the department, and from personal investigation made, believed that the current water meter of the relator is not a proper meter to measure water furnished by the city to its customers, and refused to test the meter in question, and refused to permit it to be installed.

It would appear that the relator is a manufacturer of two kinds of water meters—one designated the "Standard Disc Water Meter," and the other the "Standard Current Water Meter." The latter, it is claimed, is adapted to measuring hot water, which office, as alleged, could not be performed by any disc meter manufactured.

The relator applied to the respondent's predecessor in office for his approval of the meters manufactured by it, to the end that it might apply to the board of aldermen to obtain the approval of that body, pursuant to the provisions of section 475 of the Greater New York charter (Laws 1897, p. 165, c. 378), which vests it with power to approve of the pattern and price of such water meters as were intended to be manufactured, sold, and used within the city. The then commissioner, after testing the meters, sent to the board of aldermen a report of the tests that were made, and which, on the whole, were favorable; but, as the result of subsequent tests made, a further communication was sent to it, unfavorable to the current meter. The board adopted a resolution as follows:

"Resolved, that upon the recommendation of the commissioner of water supply, gas, and electricity, the pattern, and price of water meters manufactured by the Standard Water Meter Company of this city is hereby approved for use in the city of New York."

A dispute has arisen over the form of this resolution—as to whether it was intended to include both the disc and the current meters; the relator contending (and in this being corroborated by some of the aldermen) that it referred to both kinds of meters, while the commissioner insists that the resolution was not intended to include the current water meter, but through inadvertence the resolution was adopted, approving in general terms, instead of specifically designating the Standard disc meter. In view of the conclusion which we have reached, and for reasons which may be briefly stated, it is at present unnecessary to decide this question as to the scope and intent of the resolution.

It appears that after this proceeding was commenced the commissioner communicated with the relator, stating that, if the company would send to the pipeyards two specimens of their current water meters, he would within six weeks make thorough tests, and, if the tests were satisfactory and reached the standard requirements of the department, he would permit the installation of this particular style of meters, subject to individual tests of meters before use, under the regulation of the department. This proposition was accepted by the relator, and this proceeding was adjourned, and ten current meters of the relator were thereafter sent to the pipeyard; but, as the result of the tests made, the foreman "reported that the said current water meters are unreliable, and will not stand the test for endurance, and are absolutely unfit for use for measuring water furnished to consumers by the city." As the result of these tests and report, the commissioner concluded "that current water meters, on account of their unreliability, are not fitted for the intended use." And he informs us that "no current meter, either of this company [the relator] or of any other make, is used in this city to measure water furnished by the city to its customers." There is no suggestion in the relator's papers that the current meter which he now wants tested is any better or different in principle or kind than those heretofore tested, and it is not claimed that with respect to such current meter a new test would result differently, or alter the conclusion already arrived at by the commissioner as to the unreliability of current me-

ters. To show the commissioner's attitude, we can best quote his own language, as follows:

"Deponent says that he is willing to test any current water meters of the relator, * * * if a reasonable time be allowed for the purpose of putting such current water meters through a substantial test, but that, as for making a short test of said current water meters, in view of the reports already referred to, * * * showing that the current water meters are unfit for use, it is submitted that it would be idle to make any more short tests of that nature."

There having been, therefore, a fair testing of current meters, unless the relator would take advantage of the offer made of putting some of them again through a more substantial test, it would, as suggested by the commissioner, be idle to compel him to go on indefinitely, in view of the conclusion already reached as to their unreliability, under short tests of individual or particular meters. To succeed, therefore, the attitude of the relator must necessarily be that, under the law, the commissioner, after meters have been approved, as to pattern and price, by the board of aldermen, has no discretion, except to go on, when requested, and test and approve them. We say, advisedly, "test and approve," because, if the commissioner has any discretion, after testing, to reject and disapprove, it is quite evident that, after the tests already made, he is opposed to approving current meters of any make, because he has found them to be inadequate and unreliable.

We do not think that, upon any fair construction of the language of section 475 of the Greater New York charter, this attitude or position of the relator can be sustained. It is therein provided that:

"The commissioner of water supply is authorized in his discretion to cause water meters the pattern and price of which shall be approved by the board of aldermen to be placed in all stores," etc., "* * * and if authorized thereto by resolution or ordinance of the board of aldermen in all apartment houses," etc.

The effect of this law is to vest in the board of aldermen the power to select the pattern and price of all meters which are to be used in the city, and it is within the discretion of the commissioner to determine, subject to the limitation expressed in the section, in what places such meters shall be located. Pursuant to rule 13 of the department of water supply, gas, and electricity—which department is given the power to make such rules—it is provided that "all meters before being placed must be sent * * * to the department pipeyards to be tested."

Taking together, therefore, the section of the charter and the rule, we find that, after approval of the pattern and price of meters by the board of aldermen, it is still necessary that they should stand the test to which they are required to be subjected by the department before being placed in the building or on the premises where the commissioner, in his discretion, directs that they shall be located. There can be no doubt but that, with respect to meters the pattern and price of which have received the approval of the board of aldermen, it becomes the duty of the commissioner, upon request, to test them; and where, generally, they are suitable for the purpose, the commissioner could not refuse to test a particular or individual me-

ter, and this notwithstanding that he might have found at times that other and different meters of the same kind were defective. Of course, with respect to individual meters, the discretion is still vested in the commissioner to reject them, if, after a test, they are found to be defective or unsuitable. Where, however, the test has applied to all of the meters of a particular kind, and thereafter the objection of the commissioner is directed to the principle upon which the meters are constructed, and from the test he has concluded that one and all of them are unsuitable and unreliable, it would be a useless and an idle ceremony to compel him to go on indefinitely making individual tests, merely for the purpose of reaching the same conclusion and rejecting the meters.

There being nothing to show, therefore, that the individual current meter which was here presented for testing in any way differed in principle in pattern or in kind from those already tested and rejected by the commissioner, it was unnecessary and useless for him to make such additional tests as were requested; nor do we think that the court would be justified in compelling him to do that which would result in nothing else but consuming the time of the commissioner and those in his office to whom the detail work would be confided. Had it been shown that the current meter here in question was an improvement in principle or in kind, or different in any way from those formerly presented, or that the commissioner arbitrarily or in bad faith refused to make the test, an entirely different question would arise. In the absence of such a showing, however, and in view of the attitude of the commissioner, which, from the tests made of current meters, seems fair and reasonable, we would not be justified in requiring him to test this particular current meter; and in no event would we have the power to compel the commissioner to allow the installation of the meter offered.

It may be suggested that this construction of the discretion vested in the commissioner would negative and destroy the power vested in the board of aldermen to approve of the pattern of meters, and in this instance it no doubt follows that the conclusion of the commissioner will be to prevent the use of the current meters of the relator in the city. Notwithstanding this, however, we think that where, as here, discretion is vested in the commissioner, after testing and finding a meter unsuitable, to refuse to permit it to be installed, the discretion thus vested in him to reject one gives him the right to reject all, if it appears, as in this case, that the vice or fault shown by testing exists in all, and that the reasons which demand the rejection of one meter equally apply to all.

We think that the order appealed from was right, and should be affirmed, with costs.

Order affirmed, with costs.

INGRAHAM, J. I concur with Mr. Justice O'BRIEN in his opinion, but I also think that the resolution of the board of aldermen was not an approval of the relator's water meters, within the provision of section 475 of the charter (chapter 466 of the Laws of 1901). That section provides:

"The commissioner of water supply is authorized in his discretion to cause water meters, the pattern and price of which shall be approved by the board of aldermen, to be placed in all stores," etc.

The approval here contemplated seems to me to be the approval of a particular style or pattern of meter, to be sold at a particular price; and the resolution of the board of aldermen, to be a compliance with this statute, must identify the particular pattern approved, and the price at which it is to be sold, so that the pattern and price are identified. The resolution under which the relator claimed his right to use these meters in the City of New York provides:

"Resolved, that upon the recommendation of the committee of water supply, gas and electricity, the pattern and price of water meters manufactured by the Standard Water Meter Company of this city, is hereby approved for use in the city of New York."

There is here no statement of the pattern of the water meter that is approved, or the price at which it is to be sold, and I do not think that such a resolution is a compliance with the statute which justifies the relator to require the city of New York to use any pattern of any water meter that he manufactures, at any price that he may charge for it.

PATTERSON, HATCH, and LAUGHLIN, JJ., concur.